UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ARTHUR RAY WILSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket no. 08-cv-338-P-S |
| | ) |
| MOULISON NORTH CORPORATION, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Before the Court is the Motion for Summary Judgment (Docket # 27) by Defendant Moulison North Corporation. As explained herein, the Court GRANTS Defendant's Motion for Summary Judgment (Docket # 27).

**I.  SUMMARY JUDGMENT STANDARD**

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in

its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trial-worthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trial-worthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

With this standard in mind, the Court proceeds to lay out the factual narrative presented via the parties' statements of material fact.

## II. FACTUAL BACKGROUND

Defendant Moulison North Corporation is a corporation owned by Ken Moulison in the business of performing heavy electrical utility work, mainly airport lighting projects. Plaintiff Arthur Ray Wilson, who is African-American, was employed by Defendant Moulison North Corporation from May 22, 2006 until he injured his back at work on September 28, 2006.

At the time of his hiring, Plaintiff was given an employment manual, which contained Defendant's policies on reporting harassment and discrimination. Defendant's racial discrimination policy directed any employee with a question or complaint to contact Ken Moulison, who was the designated equal opportunity employment officer, and provided a contact phone number. Plaintiff signed an acknowledgement indicating that he had received and understood Defendant's employment policies.

During his employment with Defendant, Plaintiff was assigned to projects at the Portland Jetport and the Manchester Airport.  At the Portland Jetport, Plaintiff worked as a laborer.  He often worked with Ryan Polley, who was an operator and the most senior person at the jobsite.  Plaintiff believed that Polley was his supervisor because Polley would give the employees their daily work assignments and generally knew what needed to be accomplished on the job.  Polley had received no training on Defendant's harassment and discrimination policies and was not expected to help enforce those policies.  Polley did not have the authority to hire and fire laborers, including Plaintiff, and could not make discipline recommendations.   Bill Rowe was the foreman for both the Portland Jetport and the Manchester Airport jobsites.  Rowe had received training on the Defendant's policies and was expected to help enforce them.  Plaintiff worked directly with Rowe periodically and knew that Rowe was a supervisor.

A few days after Plaintiff began working at the Jetport, William Stineford, one of Plaintiff's co-workers called Plaintiff "Aunt Jemima" and referred to the type of work they were doing as "nigger-work."  Plaintiff immediately reported the incident to Polley, who, out of common courtesy, asked Stineford to watch his language.  After this incident, Polley generally kept Plaintiff working with him while Stineford worked with another employee on other projects.  Plaintiff continued to hear Stineford using racially-insensitive language.  He reported this language to Polley for about a week but no further action was taken.  Polley did not get involved because he did not feel it was any of his business.

When Plaintiff failed to get any response from Polley, he contacted Ken Moulison to report Stineford's conduct.  Moulison told Plaintiff that he would not put up with inappropriate language, and that he would personally come to the jobsite the next day to deal with the problem.  The next day Moulison went to the Jetport and spoke with Stineford about his behavior.

Stineford was told that if Moulison received another complaint from Plaintiff, Stineford would be terminated. Stineford was only verbally reprimanded; he was not demoted or terminated and did not lose any pay.

Plaintiff saw Moulison as he was leaving the jobsite after speaking with Stineford. Moulison explained to Plaintiff that he had met with Stineford and that Plaintiff was to contact Moulison if the harassment continued. Plaintiff was pleased with the way Moulison handled the incident. After this conversation, Plaintiff believed that he could report discriminatory behavior to either Polley or Moulison.

Plaintiff continued to hear Stineford use racially insensitive language, including the phrase "nigger-rigged", on a near daily basis. He attempted to speak with Moulison one day on the jobsite at the Jetport but was told that Moulison was too busy. Moulison left the jobsite before Plaintiff could speak with him. After that day, Plaintiff felt that further attempts to speak with Moulison would be fruitless.

A couple of weeks after he reported the harassment to Moulison, Plaintiff was assigned to work at the Manchester Airport project. Polley was also assigned to work at the Manchester Airport, but he was not the most senior person at that site. Co-workers at that facility once used the term "nigger-rigged" in Plaintiff's presence. Plaintiff also heard another co-worker use the term "nigger" on one occasion, though it was not directed at Plaintiff. Plaintiff thought that Roger Beaubien, who he viewed as his supervisor at the Manchester Airport project, overheard these comments but no action was taken against the co-workers. Plaintiff did not report these incidents to anyone.

Other than the June 5, 2006 phone call, Plaintiff did not report any of the harassing behavior to Moulison. When Plaintiff was commuting to Manchester, he would regularly see

4

Moulison's car at the office and knew that Moulison was inside, but he never went in to speak with Moulison. Plaintiff eventually injured his back while working on the Manchester Airport project and was unable to work. Plaintiff is currently receiving social security disability benefits and has never attempted to return to work for Defendant.

## III.   DISCUSSION

Based on the above-described events, Plaintiff brings the instant lawsuit alleging a hostile work environment based on race and retaliation for reporting racial harassment. Defendant moves for summary judgment on both of Plaintiff's claims and each will be addressed in turn below.

### A.   Hostile Work Environment

To prevail on a claim of hostile work environment, a plaintiff must establish: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on race; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that the objectionable behavior was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and that the victim did in fact perceive it to be so; and (6) that some basis for employer liability exists. O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001). The Court will assume that Plaintiff has satisfied the first five criteria and evaluate only whether Plaintiff has shown that there is some basis for employer liability in this case.

It is undisputed that no supervisory-level employees were involved in creating a hostile work environment in this case. The only individuals alleged to have engaged in harassing behavior were on the same level as Plaintiff within Defendant's hierarchy. "To establish

5

employer liability for a non-supervisory co-employee, a plaintiff must demonstrate that the employer knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate action." Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002) (internal quotation omitted). "Ordinarily, where . . . harassment is by a non-supervisory co-worker, the employer is liable only if the plaintiff can demonstrate that the employer was negligent." Reed v. MBNA Marketing Sys., Inc., 333 F.3d 27, 32 (1st Cir. 2003). Defendant contends that Plaintiff has failed to show either that it knew or should have known about the harassment or that it failed to respond appropriately.

The parties dispute the extent to which Defendant had knowledge of the harassment. Defendant admits knowledge of only one incident of harassment, which stems from the phone call Plaintiff made to Moulison on June 5, 2006. Plaintiff agrees that the June 5 incident is the only time that he contacted Moulison directly. However, Plaintiff argues that he informed Polley of the harassment on a number of additional occasions and that Polley's knowledge should be imputed to Defendant.

An employee's knowledge of harassment is imputed to the employer "when the employee is employed to report or respond to . . . harassment." Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 107 (3d Cir. 2009). Typically, this occurs in two circumstances: (1) where the employee is sufficiently senior in the employer's hierarchy "so that knowledge is important to the employee's general managerial duties;" and (2) where the employee is specifically employed to deal with harassment, such as human resources personnel. Id.

In this case, it is undisputed that Polley was not employed specifically to deal with issues such as harassment. The only issue is whether Polley was sufficiently senior in Defendant's hierarchy to impute his knowledge of the harassment to Defendant. The First Circuit has

6

adopted a stringent test for determining whether an employee is a supervisor for purposes of harassment. "The key to determining supervisory status is the degree of authority possessed by the putative supervisor. Thus, courts must distinguish employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers." Noviello v. City of Boston, 398 F.3d 76, 95 (1st Cir. 2005) (internal citation omitted). The First Circuit has held that "the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment" primarily the ability to hire, fire, transfer or discipline the employee. Id. at 96 (adopting the Seventh Circuit's approach in Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1033 (7th Cir. 1998)).

In this case, Plaintiff has failed to show that Polley was a supervisor, as that term is defined by the First Circuit.[1] While Polley directed Plaintiff's work at the jobsite, he did not have the authority to hire, fire, transfer or discipline Plaintiff. There is no evidence that Plaintiff believed that Polley had the authority to hire, fire, transfer or discipline him; Plaintiff believed that Polley was his supervisor simply because Polley was the individual on-site who knew what had to be done. At the time of these events, Polley had received no training on implementing or enforcing the Defendant's harassment policies.[2]

The fact that Polley was often the most senior employee on the jobsite does not necessarily mean that he was a supervisor. See Davis v. Cumberland Cty., No. 04-143-P-S, 2005 WL 1412419, *12 (D. Me. June 16, 2005) ("There are times when any supervisor will be physically absent from the workplace; that absence does not by itself transform another

---

[1] The Court notes that other circuits have adopted a more broad definition for the term supervisor. See Mack v. Otis Elevator Co., 326 F.3d 116, 126 (2d Cir. 2003) (holding that an individual who has and exercises the authority to make and oversee the daily work assignments of the plaintiff is a supervisor for purposes of establishing a hostile work environment); Hirschfeld v. New Mexico Corrections Dep't, 916 F.2d 572, 579 (10th Cir. 1990). The First Circuit explicitly rejected this broader definition in Noviello and instead adopted the Seventh Circuit's more narrow approach. See Noviello, 398 F.3d at 96 n.5.

[2] Polley was promoted to foreman in 2007 and was given training on Defendant's harassment policies.

employee into a supervisor.")  Moreover, Plaintiff's belief that Polley was his supervisor does not make it so; the First Circuit has made clear that actual authority is the determinative factor. See Noviello, 398 F.3d at 96 (holding that courts must "shift focus to those persons whose actual authority made them supervisors" to prevent elevating nomenclature over actual authority).

Because Plaintiff has not established that Polley was a supervisor, Plaintiff's reports to him cannot be included in the analysis of whether Defendant had notice of the harassment. See Davis, No. 04-143-P-S, 2005 WL 1412419 at *13.  Plaintiff never reported the harassment to Bill Rowe, the foreman for both the Portland Jetport and Manchester airport jobsites.  Plaintiff reported the harassment to Ken Moulison on only one occasion, during the June 5th phone call. Defendant does not dispute that it had knowledge of the harassment reported during this phone call.  The sole remaining issue, therefore, is whether Defendant's response following the June 5th phone call was adequate.

The First Circuit has not set a standard for what constitutes "prompt and appropriate action" when responding to a harassment complaint.  It has noted, however, that "[a] reasonable jury could find that an employer response was not prompt and appropriate without being so indifferent as to indicate an attitude of permissiveness amounting to discrimination." Forrest v. Brinker Intern. Payroll Co., 511 F.3d 225, 231 n.8 (1st Cir. 2007). Other circuits have held that the employer's response must be "reasonably calculated to end the harassment."  Waltman v. International Paper Co., 875 F.2d 468, 479 (5th Cir. 1989).  See also Ford v. West, 222 F.3d 767, 776 (10th Cir. 2006); Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999); Intlekofer v. Turnage, 973 F.2d 773, 782 (9th Cir. 1992); Bundy v. Jackson, 641 F.2d 934, 947 (D.C. Cir. 1981). Examples of responses that have been deemed appropriate "have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes or

transfers, oral or written warnings, reprimands, and warnings that future misconduct could result in progressive discipline." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 675 (10th Cir. 1998).

During the conversation with Plaintiff in which Moulison learned of the harassment, Moulison told Plaintiff that such behavior would not be tolerated and that he would address the situation. The day after Moulison learned of the harassment at the Portland Jetport, he spoke with Polley to investigate what had been occurring between Plaintiff and Stineford. Polley confirmed that he had overheard Stineford use inappropriate language. Moulison told Polley to let Stineford know that Moulison was coming to the jobsite the next day to discuss Stineford's behavior.

The following day, Moulison personally went to the Portland Jetport and met with Stineford for about fifteen minutes. Moulison was very angry and told Stineford that racially-insensitive language would not be tolerated. Stineford was informed that if Moulison received any further complaints from Plaintiff, Stineford would be fired. Prior to this incident, Stineford had never heard Moulison raise his voice. Stineford characterized the conversation as a "good chewing out," and understood that he would immediately be fired if Moulison received another complaint. (William Stineford Dep. (Docket # 28-4) at 43-44.)

Plaintiff argues that Defendant's response was inadequate because Stineford was not fired, suspended or demoted and did not lose any pay. While merely asking an employee to apologize is an insufficient response, the law does not require that an employer fire a harasser. See Green v. Franklin Nat. Bank of Minneapolis, 459 F.3d 903, 912 (8th Cir. 2006). Where, as here, the plaintiff's complaint is the first instance of harassment of which the employer is aware, a strong verbal reprimand has been deemed an appropriate response. See Forrest, 511 F.3d at 232 (noting that a progressive discipline approach that started with an oral warning was

appropriate); see also Scarberry v. Exxonmobil Oil Corp., 328 F.3d 1255, 1259 (10th Cir. 2003) (holding that an individual counseling and verbal warning was "prompt and adequate as a matter of law."); Perry v. Ethan Allen, Inc., 115 F.3d 143, 154 (2d Cir. 1997) (immediately investigating harassment, confronting harasser, and explaining that harassment would not be tolerated was appropriate corrective action).

The Ninth Circuit has held: "At the first sign of . . . harassment, an oral warning in the context of a counseling session may be an appropriate disciplinary measure if the employer expresses strong disapproval, demands that the unwelcome conduct cease, and threatens more severe disciplinary action in the event that the conduct does not cease." Intlekofer, 973 F.2d at 779-80. That is exactly what Defendant did in this case. The day after Moulison learned of the harassment, Moulison counseled Stineford that the language he was using would not be tolerated, demanded that he stop using inappropriate language, and informed Stineford that he would be fired if another complaint was received. Having considered the facts of this case in the light most favorable to the Plaintiff, the Court finds that Defendant responded promptly and appropriately to the June 5th complaint of harassment. Plaintiff has failed to establish a trial-worthy issue as to whether there is employer liability for the hostile work environment created by Stineford. Accordingly, Defendant's Motion for Summary Judgment is GRANTED with respect to Count I.

### B.    Retaliation

Count II of Plaintiff's Complaint alleges that he was retaliated against for having reported the harassment. To establish a claim for retaliation, plaintiff must show: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal link existed

between the protected activity and the adverse employment action. See Thompson v. Coca-Cola Corp., 522 F.3d 168, 181 (1st Cir. 2008).

Defendant has moved for summary judgment as to Count II arguing that Plaintiff has failed to show a material factual dispute as to the second and third prongs of the test for retaliation. Plaintiff's opposition to the instant motion does not address his retaliation claim at all. Despite this failure, the Court has considered the merits of Plaintiff's retaliation claim. See FDIC v. Bandon Assoc., 780 F. Supp. 60, 62 (D. Me. 1991) (explaining that the Federal Rules of Civil Procedure require the Court to examine the merits of a motion for summary judgment regardless of the opposing party's failure to object). In short, having reviewed the facts in the light most favorable to the Plaintiff, the Court finds that he has failed to establish a trial-worthy issue as to whether he suffered an adverse employment action. It is undisputed that Plaintiff was injured on the job and left his employment with Defendant due to that injury. In fact, Plaintiff still suffers from the effects of that injury and has never attempted to return to work with Defendant. There is absolutely no evidence in the record showing that Plaintiff was subjected to an adverse employment action. Accordingly, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's claim for retaliation.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Docket # 27) is GRANTED. Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

SO ORDERED.

                                        /s/ George Z. Singal  
                                        United States District Judge

Dated this 3rd day of March, 2010.